### EDWARD G. BUDD MFG. CO. v. NATIONAL LABOR RELATIONS BOARD.

#### No. 8054.

Circuit Court of Appeals, Third Circuit.

Heard on Rule to Show Cause May 1, 1944.
Decided May 12, 1944.

Henry S. Drinker, of Philadelphia, Pa., for petitioner.

924

A. Norman Somers, of Washington, D. C., for the Board.

Before JONES, and GOODRICH, Circuit Judges, and GANEY, District Judge.

JONES, Circuit Judge.

The National Labor Relations Board seeks an order adjudging Edward G. Budd Manufacturing Company (hereinafter referred to as "the Company") and Edward G. Budd, the Company's president, guilty of contempt because of their alleged violation of this Court's decree enforcing a Board order against the Company. The matter was argued and submitted on the Board's petition (whereon a rule to show cause issued in course) and the joint answer and amended answer of the Company and of Edward G. Budd individually. The contempt charge is made to rest upon the following circumstances.

As a result of a complaint proceeding duly instituted on charges made by the United Automobile, Aircraft and Agricultural Implement Workers of America (a C.I.O. affiliate hereinafter referred to as "the Union"), the Board found the Company guilty of unfair labor practices in that it (1) had dominated and interfered with the administration of Employees' Representation Association (hereinafter referred to as "the Association"), a labor organization admitting to its membership employees of the company, and (2) had discriminatorily discharged two employees because of their membership and activities in the Union. The unfair labor practices, so found, being violative of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Board accordingly entered an appropriate remedial order designed to abate the Company's unlawful conduct and to secure to its employees for the future the freedom of choice in their labor affiliations and activities which the law accords them.

Thereafter, upon the Company's petition at the above number and term, seeking to have the Board's order set aside, and upon answer thereto by the Board, praying a decree of enforcement, this Court sustained the Board's order (3 Cir., 138 F.2d 86) and entered a decree directing that the order be enforced. The decree appears in full in the addendum to this opinion.

In general, the decree directed the Company to cease and desist from the unfair labor practices, whereof it had been found guilty, and to take certain affirmative action including the posting of notices of its intention to comply. Immediately upon the decree's becoming operative (following the Supreme Court's denial of certiorari, 64 S.Ct. 619), the Company posted the required notices, disestablished the Association forthwith, fulfilled the requirements of the decree as to the two discharged employees and duly notified the Regional Director for the Labor Board of the steps thus taken to comply with the decree.

The Board concedes that the Company's compliance with the decree, as above stated, was both timely and adequate for the purpose and that there would be no question of a contempt were it not for two letters (rather a letter and an enclosure), on Company stationery, which Edward G. Budd, the Company's president, signed and mailed to each of the Company's employees contemporaneously with the posting of the notices by the Company. The letter and the enclosure in that order are shown in full in the addendum.

The letter indicated that the decree had become effective upon the Supreme Court's denial (February 28, 1944, 64 S.Ct. 619) of the Company's petition for a writ of certiorari and that thereby the Company was compelled to withdraw its recognition of the Association as the bargaining agent of its employees, which, as the letter went on to state, "places upon you and your fellow workers the responsibility of the future". The letter then suggested that the employees "may decide to: a. have no union at all in the plant, b. affiliate with an outside organization, c. form an independent union of your own." The letter further stated that: "In any event, yours is the freedom of choice. You should, however, not act without a complete knowledge of the facts concerned, and I am therefore setting forth in the attached pages a detailed statement for your consideration." The letter concluded by urging the employees to "read these pages carefully, and give them your mature deliberation before arriving at a decision."

The enclosure may justly be characterized as an undisguised and unmistakable effort on the part of Budd to impress the Company's employees with the fact that they were free to *form* a union of their own as well as to *join* an outside one and to argue to them the advantages, as he saw them, to be derived by the employees from a union of their own.

In the latter connection the enclosure cited, what Budd denominated, "10 years of

industrial peace" in the Company's plants while the Association had served as bargaining agent and set forth figures to show the increases in wages in that period under contracts negotiated annually with the Company by the Association during which time the Company had not paid any dividends on its common stock and none on its preferred except for two quarterly dividends paid since the summer of 1943. The enclosure stated that the Association had been chosen over a local of the A. F. of L. as the employees' bargaining agent by secret ballot at an election in 1934 and that in 1941 the Union had "made an unsuccessful drive to induce the employees to desert" the Association and "to choose and pay dues to the C.I.O. Local as their bargaining representative" and that, at the same time, the Union had made the charge of Company domination of the Association which had resulted in the Board's order of disestablishment. The enclosure then stated that, since the Supreme Court had declined to take the case, "we will of course obey the Labor Board's order in good faith even though we still believe it to be wrong, unfair and contrary to the best interests of the employees."

The enclosure also admonished the employees that "You must now decide whether you want to have a bargaining agency, and if you do, whether it will be more to your advantage to choose one of the outside unions or, on the other hand, to form your own organization. This you have a perfect legal right to do." Then followed a quotation of Section 7 of the National Labor Relations Act in full. The enclosure expressed the Company's complete recognition of the right guaranteed employees by the Act and said that "membership in any organization that you may choose to join or to form will not affect the position or prospects in the Company of any employee." The employees were further told that it was not necessary for them "to join any particular labor organization", that there was no law requiring or compelling them "to pay dues or to join any organization" and that, if they decided to form an independent union, the Company, although entirely agreeable to the idea, "can and will do nothing whatever to assist you" but would recognize such an association when satisfied that it was properly formed and had the support of a majority of the employees.

The enclosure counselled the employees, when deciding their preference between an outside union and an organization of their own, to "make up your mind which form of representation will be better for you as an employee of this Company and which one will be more likely to enable your Company to operate most efficiently and continue to be able to pay you the highest wages" and concluded by posing the following questions. "To what kind of leadership are you going to entrust your future with this Company? Is it unselfish leadership, or is it not? Is it interested in your personal, individual welfare, or is it self-seeking? If an outside organization, on the basis of its past record is it open and above board and dependable, or don't you know? These are questions you should think about and talk over at home."

The Board contends that, in the circumstances obtaining, the implications to be taken from the argument contained in the letter and its enclosure in favor of an independent union, as contrasted with an outside union, constitute violations of paragraph 1 of the decree that the Company cease and desist from "(b) Dominating or interfering with the administration of, and contributing * * * support to, * * * any other labor organization of its employes" and "(e) In any other manner interfering with, restraining, or coercing its employees in the exercising of the right to self organization, * * * [and] to bargain collectively through representatives of their own choosing * * *, as guaranteed in Section 7 of the Act" and also of paragraph 2 (d) (3) with respect to the notice that the Company's "employees are free to become or remain members of" the Union and that the Company "will not discriminate against any employee because of membership or activity on behalf of said labor organization."

The respondents reply (1) that the writings are privileged under the First Amendment as expressions of opinion, and that a lawful exercise of the privilege must necessarily lie beyond the intended scope of the decree and (2) that the exercise of the privilege was lawful because it involved no threats or acts of domination, coercion or intimidation nor was it otherwise violative of the rights guaranteed employees by Section 7 of the Labor Act.

Except for the letter and its enclosure there is admittedly no basis for a sugges-

926

tion that either Budd or the Company have acted in contempt of this Court's decree. The Board's brief concedes that "respondent Company, on February 29, 1944, posted a notice substantially in accordance with the directions in paragraph 2 (d) of the Decree * * *". In fact, the notice contained a verbatim copy of the decree and the Company additionally and affirmatively engaged to carry out each and every of the requirements of the decree, specifically including the requirement not to "discriminate against any employee because of membership in or activity in behalf of" the Union. It is also a fact that, on the same day the notices were posted, the Company formally took open and affirmative action in withdrawal of all recognition from and in avowed disestablishment of the Association. And, coincidentally, the Company fulfilled the requirements of the decree with respect to the two discriminatorily discharged employees and duly notified the Regional Director for the Labor Board of the steps thus taken to comply.

■■ We fail to see how the letter and enclosure standing alone can be thought to violate anything contained in the decree. Certainly, there is no direct prohibition in the decree purporting to restrain the employer or its officers or agents from entertaining opinions on labor matters or on any other subject or from giving such opinions free expression. Nor could the decree validly contain any such prohibition. "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." See Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093.

■■ It can hardly be questioned that the constitutional guaranty protects the employer and the employee alike. Thus, to make known the facts of a labor dispute has been recognized as a constitutionally protected right of a member of a union. Senn v. Tile Layers Protective Union, 301 U.S. 468, 478, 57 S.Ct. 857, 81 L.Ed. 1229. And, in Midland Steel Products Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 800, 804 it was appropriately said that "Unless the right of free speech is enjoyed by employers as well as by employees, the guaranty of the First Amendment is futile, for it is fundamental that the basic rights guaranteed by the Constitution belong equally to every person." Again, in Na-

tional Labor Relations Board v. Lightner Pub. Corporation, 7 Cir., 113 F.2d 621, 626, the court said that "obviously the National Labor Relations Board has no authority to interfere with an employer's untrammelled expression of views on any subject." Cf. National Labor Relations Board v. Sterling Electric Motors, Inc., 9 Cir., 109 F.2d 194, 204. For like reason, a court, in enforcing a Labor Board order, lacks any such authority. The decree, therefore, is not to be construed as requiring something which it is beyond our power to direct.

■■ The Wagner Act does not purport to authorize a restraint upon freedom of speech in any circumstances. "Nowhere in the National Labor Relations Act is there sanction for an invasion of the liberties guaranteed to all citizens [persons] by the First Amendment." See National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F.2d 905, 914, certiorari denied 312 U.S. 689, 61 S.Ct. 621, 85 L.Ed. 1126. Had there been any such provision in the statute, it would have been invalid as in contravention of the First Amendment. Midland Steel Products Co. v. National Labor Relations Board, supra, 113 F.2d at page 804; National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 99 F.2d 153, 178. Accordingly, it is our opinion that it was not the intention of Congress in the Labor Act to forbid an employer from expressing opinions as to labor unions or as to anything else so long as his expressions do not constitute, or contribute to, acts or threats of discrimination, coercion or intimidation in denial of his employees' free and untrammelled exercise of their rights as guaranteed by the Act. Cf. Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949, 956, quoting from National Labor Relations Board v. Union Pacific Stages, loc. cit. supra.

■ Because of the qualification just mentioned, an employer's right to speak freely concerning labor matters does not automatically carry with it freedom from responsibility for the reasonably foreseeable consequences of his utterances. Thus an expression may be actionable because of its direct, intended and unmistakable wrongful import or it may take on evidentiary value as revealing of the improper intent, motive or purpose of other conduct which, alone, might be ambiguous or equivocal. See National Labor Relations Board v. New Era Die Co., Inc., 3 Cir., 118 F.2d 500, 505

where, in answering the employer's contention that certain statements made by its management were privileged under the First Amendment, we said that "The fact that expression is free does not mean that the utterer may not be called upon to answer for it by way of being held accountable for the effect of his expressions." But that, in turn, does not mean that one's right to entertain opinions and to give them free expression may be peremptorily foreclosed for the future by either Board order or court decree.

■ Whether the constitutionally protected right of free speech has been abused by an expression of fact or opinion, so as to render the matter actionable as a violation of the Wagner Act, comes down to the question whether the assailed utterances constitute, or are in furtherance of, employer domination, coercion or interference in his employees' exercise of their legal rights. The inquiry, therefore, in any relevant connection is whether the challenged statements or opinions contain, or, in the circumstances, can reasonably be construed as containing, threats by the employer of discrimination or other coercive or intimidating action against some employees or an allurement of favoritism to others according to their respective labor affiliations or activities. If the utterances do so offend, then they are actionable, for the Wagner Act is aimed directly at such conduct and furnishes the effective means for its eradication.

We have then to examine the statements contained in the letter and enclosure in order to determine "whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." Per Justice Holmes in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470.

■ Admittedly, neither the letter nor the enclosure contains any direct threat of loss of employment, discrimination or other act of intimidation or coercion. And, so far as concerns the implications, upon which the Board bases its case and which it would, perforce, have us arbitrarily and conclusively draw from the letter and the enclosure, it is also to be noted that the letter assured the employees that "yours is the freedom of choice" and the enclosure affirmed that "membership in any organization that you may choose to join or to form will not affect the position or prospects in the Company of any employee." But, the Board reminds us that "Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure" (citing International Association of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 78, 61 S.Ct. 83, 85 L. Ed. 50, and other cases) and asserts that the statements in the letter and enclosure that the employees are free to form a union as well as join one and the argument as to the benefits from a union of their own, inferred from the experience of the Association, amount to such suggestions.

We are unaware of any case where slight suggestions, standing alone, have been held sufficient to sustain even a finding of unfair labor practices (as distinguished from a finding of contempt). Cf. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 478, 62 S.Ct. 344, 86 L.Ed. 348, and National Labor Relations Board v. American Tube Bending Co., 2 Cir., 134 F.2d 993, 995, 146 A.L.R. 1017, certiorari denied 320 U.S. 768, 64 S.Ct. 84. It will be observed that, when the Virginia Electric case went back to the Supreme Court (319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568), "the bulletin * * * and the speeches" had by then been "considered [by the Board] not in isolation but as *part* of a pattern of events adding up to the conclusion of domination and interference." (Emphasis supplied.) Yet, in the case of unfair labor practices, merely civil sanctions are imposed for their abatement in the public interest while here the proceeding envisions the imposition of penal sanctions on the alleged offender personally upon the court's summary adjudication of his guilt.

And, what is the effect which the Board ascribes to the present "slight suggestions" which it draws from the letter and the enclosure? Merely that Budd's expression of desire, that the Company's employees form their own union, operates to intimidate and coerce the employees into doing what they would not otherwise do in a free exercise of their guaranteed rights under the Act. In this day of enlightenment as to labor's legally established and widely recognized rights, we think that the Board's imputation is as disparaging of the intellect of the

928

Company's employees as it is unrealistic. See E. I. Du Pont, etc., v. National Labor Relations Board, 4 Cir., 116 F.2d 388, 398, certiorari denied 313 U.S. 571, 61 S.Ct. 959, 85 L.Ed. 1529; National Labor Relations Board v. Ford Motor Co., supra, 114 F.2d at page 914. If there be any employees of the Company who do not know that, notwithstanding their employer's desires and wishes, they are wholly free to do whatsoever they will in the exercise of their right to self-organization and to bargain collectively by representatives of their own choosing, without fear of any discrimination or reprisal by the employer, then the words of this Court's decree have failed to make plain what we think the decree actually provides.

 Before we could adopt and then act upon the assumption of fact which the Board urges, we should first have to find, contrary to the reasonable implications of the situation, an employer-dominated state of mind in the employees merely because of Budd's letter and the enclosure. That, we could not justly do without more definite proof of the essential fact which the Board asks us to infer. Contrasted with the inference which the Board draws, the letter and enclosure are also susceptible of an inference that, thereby, Budd sought to do no more than make certain that the Company's employees understood that they were not required to join any particular union and that they were free to form their own and, further, to argue that, on the basis of what he cited as employee benefits attributable to the Association's services in the past, they would do well to form their own union. At bar, counsel for the Board conceded the permissibility of the two inferences, the one favorable and the other adverse to the respondents. That being the evidentiary situation in the absence of any direct proof at all, we have no right to adjudge guilt summarily. A contempt proceeding may serve in appropriate circumstances as the efficient means for vindicating a court's judgments or decrees, but "it is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality." See Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U.S. 287, 293, 61 S.Ct. 552, 555, 85 L.Ed. 836, 132 A.L.R. 1200 (concerned with rights under the Fourteenth Amendment).

 The Board argues that the letter and enclosure do not stand alone but are to be read and interpreted, for their effect, in the light of the Company's labor relations over the ten years preceding the decree during which time the Company had recognized and dealt with the Association as the bargaining agent of the employees and that the Association was found to have been Company-dominated. As already indicated, the acts of discouragement from affiliation with the Union, chargeable to the Company, were limited to the discharges of two employees according to the Board's findings and conclusions.

The suggestion that we revisit the respondents with the conduct upon which the Board based its findings and order completely ignores the status created by the decree which is the fulcrum of the present proceeding. The Board, having used the Company's prior misconduct as the basis for the order, which the decree enforces, would now have us use the same conduct to give ulterior point to matters occurring since the Company's affirmative submission to the decree which matters, of themselves, are otherwise privileged. If that be permissible, then an. employer, once a decree abating unfair labor practices is entered against him, can never again speak or write in expression of his views on labor problems without being hailed before the decreeing court for contempt. In passing, it is of no distinguishing moment that Budd's letter and enclosure went out contemporaneously with the Company's posting of the notices of compliance. The contempt charge could as well have. been based upon an utterance at any time subsequent to the employer's submission to the decree. The right to free speech in the future is not to be forfeited because of misconduct in the past. Cf. Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., supra, 312 U.S. at page 296, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200. This must necessarily be so if freedom of speech which is "among the fundamental personal rights and liberties" (Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949) is to be maintained inviolate. That the right is to be so maintained calls for no argument. In the words of Justice Cardozo (Palko v. Connecticut, 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288) freedom of thought and speech is "the indispensable condition, of nearly every other form of freedom."

On the record now before us, it is our opinion that the expressions contained in the letter and enclosure, standing alone as they indisputably do, are privileged and that the privilege was not lost through any threat or act of discrimination, coercion or intimidation by either of the respondents in violation of the employees' rights under the Act. The respondents have not, therefore, offended the decree. If they should so offend at any time in the future, this Court, upon a proper showing, will not be slow to vindicate its decree. Despite the fear expressed at bar by counsel for the Board, a court's decrees are no less effective merely because the court will not permit them to be construed so as to violate constitutional rights and, especially not, those guaranteed by the Bill of Rights.

The rule to show cause will be discharged.

## Addendum
## Decree

The National Labor Relations Board, having on June 10, 1942, issued an order against Edward G. Budd Manufacturing Co., petitioner herein, and the Board having requested this Court to enforce said order, and this Court having considered the same and having on September 7, 1943 issued its decision enforcing said order, it is hereby ordered, adjudged and decreed that the petitioner, Edward G. Budd Manufacturing Co., Philadelphia, Pennsylvania, its officers, agents, successors, and assigns shall:

1. Cease and desist from:

(a) Discouraging membership in International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, affiliated with the C.I.O., or any other labor organization of its employees, by discriminating in regard to their hire or tenure of employment;

(b) Dominating or interfering with the administration of, and contributing financial or other support to, Employees' Representation Association or any other labor organization of its employees;

(c) Recognizing Employees' Representation Association as the representative of any of its employees for the purpose of dealing with petitioner concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment;

(d) Giving effect to any agreements or contracts between petitioner and the Employees' Representation Association which may be in effect, or to any extension, renewal, or modification thereof;

(e) In any other manner interfering with, restraining, or coercing its employees in the exercising of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Withdraw all recognition from, and completely disestablish Employees' Representation Association as the representative of any of its employees for the purpose of dealing with petitioner concerning grievances, labor disputes, rates of pay, wages, hours of employment, or other conditions of employment;

(b) Offer to Walter Weigand and Milton T. Davis immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority and other rights and privileges;

(c) Make whole said Walter Weigand and Milton T. Davis for any loss of pay they may have suffered by reason of petitioner's discrimination against them by payment to each of them of a sum of money equal to that which he would normally have earned as wages from the date of petitioner's discrimination against him to the date of such offer of reinstatement, less his net earnings during said period;

(d) Post immediately, in conspicuous places throughout its plant in Philadelphia, Pennsylvania, and maintain for a period of at least sixty (60) consecutive days from the date of posting, notices to its employees, stating (1) that petitioner will not engage in the conduct from which it is ordered to cease and desist in paragraph 1 (a) through (e) of this Decree; (2) that it will take the affirmative action set forth in paragraphs 2 (a), (b), and (c) of this Decree; and (3) that its employees are free to become or remain members of International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, affiliated with the C.I.O., or any other labor organization of their choice, and that it will not discriminate against any employee because of member-

ship in or activity on behalf of said labor organization;

(e) Notify the Regional Director for the Fourth Region in writing within ten (10) days from the date of this Decree what steps petitioner has taken to comply herewith.

---

Edward G. Budd's
Letter to the Company's
Employees
Letterhead of
Edward G. Budd Manufacturing Co.
Philadelphia, U.S.A.
Office of the
President
Dear

I sincerely believe the attached pages contain information of vital importance to you. Briefly, the facts are as follows:

1. On Monday, the Supreme Court of the United States declined to review the decision of the Labor Board and the United States Court in Philadelphia concerning the Employees' Representation Association.

2. This decision compels the company to withdraw its recognition of the Employees Representation Association as the bargaining agency for its employees.

3. This decision further places upon you and your fellow workers the responsibility of the future. You may decide to:

a. have no union at all in the plant,

b. affiliate with an outside organization,

c. form an independent union of your own.

In any event, yours is the freedom of choice. You should, however, not act without a complete knowledge of the facts concerned, and I am therefore setting forth in the attached pages a detailed statement for your consideration.

I most strongly urge that you read these pages carefully, and give them your mature deliberation before arriving at a decision.

Sincerely yours,
Edward G. Budd
President

---

Enclosure Contained in Edward G. Budd's
Letter to Employees
Letterhead of
Edward G. Budd Manufacturing Co.
Philadelphia, U.S.A.
February 29, 1944

On Monday the Supreme Court of the United States declined to review the decision of the Labor Board and of the United States Court in Philadelphia. This will require the Company to withdraw its recognition of the E.R.A. as the bargaining agency for its employees.

The Supreme Court did not itself pass directly on the questions in controversy. Under the law, that Court need not take up every case which is brought before it, but only those cases which it considers of sufficient importance, or of sufficient public interest to make this advisable.

In order that you may understand what has happened, and what you may lawfully do, I am going to state this to you as simply as I can.

In September, 1933 our employees, desiring to form an Association of their own for collective bargaining, asked the Company to help them to draw up its By-laws, and to hold an election for Representatives. This we did—to use the words of the Philadelphia Court—in a spirit of "friendly interest" and cooperation. The Company paid for printing the By-laws and the ballots, and cooperated in holding the elections in the plant.

Later the Representatives thoroughly revised the Proposed By-laws, had them approved by Wm. H. Davis, the Director under General Johnson of the N.R.A., and distributed them to the employees, after which another election was held in March 1934. In this election the employees, by a vote of 3152 to 1995, chose, in a secret ballot, the E.R.A. over the Local of the A. F. of L. This Local had been conducting a strike, which, while it seriously interfered with production, was unsuccessful in inducing the men to choose the A. F. of L. as their bargaining representative.

Since then, for ten years the Company has dealt with the Representatives on all questions involving wages, hours and working conditions. How well they have bargained is indicated by the fact that in that time the hourly wage-rate has increased from 55 cents in 1933 to $1.19 in 1943 and the average annual wages have increased from $1092.64 in 1933 to $2795.00 in 1943. During this time the Company has not paid any dividend at all on its Common Stock, and none of its Preferred Stock except the two quarterly dividends paid since last summer.

It has always been the Company's policy and desire to pay wages as high as it can and at the same time preserve its credit, keep its plant thoroughly up to date and sell its products in competition with other

manufacturers. The present average earnings per hour are 45% above that paid in January, 1941.

During the period of the annual contracts negotiated by the E.R.A. with the Company, there has been 10 years of industrial peace in our plants. This has made it possible for the employees to have steady earnings and has enabled the Company to develop its new products and thus expand employment.

In the spring of 1941 the C.I.O. made an unsuccessful drive to induce the employees to desert the E.R.A., to which no one apparently had objected from 1934 to 1941, and to choose and pay dues to the C.I.O. Local as their bargaining representative. At the same time the C.I.O. filed a charge with the Labor Board, claiming that the E.R.A. was "company dominated" and hence unlawful. The Labor Board decided in March, 1942 that, because of the assistance given the E.R.A. in its formation ten years ago, and also because of its later having secured a share in the receipts of the Employees' Exchange (which operates the candy and tobacco booths) the Association was unlawful in its beginning and so continued in spite of the 1934 election and of all its successful operation since then.

Last fall the United States Court in Philadelphia decided that, under the Wagner Act, the Labor Board was the sole judge of the facts, and the Court was bound by its decision.

Since the Supreme Court has now declined to take up the case, we will of course obey the Labor Board's order in good faith, even though we still believe it to be wrong, unfair and contrary to the best interests of the employees. We are, therefore, posting the notices which the Board requires, and are discontinuing all further negotiations with the E.R.A.

You must now decide whether you want to have a bargaining agency, and if you do, whether it will be more to your advantage to choose one of the outside unions or, on the other hand, to form your own organization. This you have a perfect legal right to do. The Wagner Act says:

"Sec. 7—Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

The Company fully recognizes this right of its employees, and such membership in any organization that you may choose to join or to form will not affect the position or prospects in the Company of any employee. On the other hand, I feel that it should be made clear to each employee that it is not at all necessary for him to join any particular labor organization, in spite of anything he may be told to the contrary. Certainly there is no law that requires or is intended to compel you to pay dues to or to join any organization.

If you decide to form an independent union here in the plant, the Company, although entirely agreeable to this plan, can and will do nothing whatever to assist you, but would recognize such an association as your accredited bargaining agency when satisfied that it was properly formed and had the support of a majority of the employees.

In deciding whether you prefer to join an outside organization or to form a new Association of your own, you will make up your mind which form of representation will be better for you as an employee of this Company, and which one will be more likely to enable your Company to operate most efficiently and continue to be able to pay you the highest wages. Of the Company's willingness to pay the highest wages it can afford you have had ample proof over the past ten years.

To what kind of leadership are you going to entrust your future with this Company? Is it unselfish leadership, or is it not? Is it interested in your personal, individual welfare, or is it self-seeking? If an outside organization, on the basis of its past record is it open and above board and dependable, or don't you know? These are questions you should think about and talk over at home.

One thing more. We are all now engaged in making munitions and appliances for use in carrying on the War and finishing it just as fast as we can. Let us allow nothing that we may do to interfere with our maximum effort to this end.

Sincerely yours,

Edward G. Budd,
President.