NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNION NACIONAL DE TRABAJA-DORES and its Agent, Arturo Grant, Respondents.

Nos. 75–1372 to 75–1376.

United States Court of Appeals, First Circuit.

Submitted Sept. 14, 1979.

Decided Dec. 28, 1979.

John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert

E. Allen, Acting Association Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Paul Elkind, Asst. Gen. Counsel, Stanley R. Zirkin, Deputy Asst. Gen. Counsel, Washington, D. C., for contempt litigation, and Christopher Katzenbach, Atty., Washington, D. C., on brief, for petitioner.

Pedro J. Varela and Escribano, Carreras, Acevedo, Perez & Varela, Hato Rey, P. R., on brief, for respondents.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

In 1976, this court granted enforcement of orders issued by the National Labor Relations Board against appellant here, Union Nacional de Trabajadores (Union), and various of its agents, including Union president Arturo Grant, in four separate unfair labor practices proceedings. *N.L.R.B. v. Union Nacional de Trabajadores*, 540 F.2d 1 (1st Cir. 1976). In March 1978, the Board petitioned the court to find that the Union and Grant had not complied with the judgment and were in contempt of the orders. We appointed a special master to conduct a hearing and recommend findings of fact and conclusions of law. After conducting an evidentiary hearing and receiving briefs from both sides, the master found the Union and Grant in contempt and recommended various remedies. After carefully reviewing the special master's report and the record he developed, we conclude that the Union and President Grant are in civil contempt of our orders.

The underlying orders were the result of findings by the NLRB and this court that the Union had violated §§ 8(b)(1)(A), 8(b)(4)(i) and 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. §§ 158 (b)(1)(A), 158(b)(4)(i) and 158(b)(4)(ii)(B).

The behavior held to constitute such violations included: threatening employees on numerous occasions with physical injury and death if they continued to work during Union-sponsored strikes; assaulting and threatening to kill a worker who opposed the Union as the collective-bargaining representative at his plant; threatening an employee to persuade him not to testify at an unfair labor practices hearing; and, assaulting, and in one instance brutally beating, members of management. Because the court agreed with the Board that the Union had demonstrated a marked proclivity for violating the rights of employees secured by § 7 of the Act, 29 U.S.C. § 157, we upheld relatively broad orders against the Union and Grant, which enjoined them from threatening violence against employees of any employer in Puerto Rico, and also from in any manner restraining or coercing employees in the exercise of rights guaranteed by § 7 of the Act. 540 F.2d at 11. The advisability of such an order was made manifest by the Union's intransigence and denial of authority of the court, the Board and the labor laws of the United States. *Id.* We also ordered the Union to publish in newspapers of general circulation and mail to affected employees notices prepared by the Board. We thought the publication and mailing requirements warranted not only because they would give notice to interested parties, but because they would "ha[ve] the salutary effect of neutralizing the frustrating effects of persistent illegal activity by letting in 'a warming wind of information and, more important, reassurance'." 540 F.2d at 12, *quoting J. P. Stevens & Co. v. N. L. R. B.*, 417 F.2d 533, 540 (5th Cir. 1969).

■ The special master received evidence on two instances of allegedly contumacious conduct.[1] First, the Board alleges that the

---

1. We may summarily dispose of the Union's claim that the underlying decree is void on its face for overbreadth and vagueness. This argument is out of season. First, a party cited for contempt of a permanent injunction may not then collaterally attack the validity of the underlying decree. *N.L.R.B. v. Local 282, International Brotherhood of Teamsters, Etc.*, 428 F.2d 994 (2d Cir. 1970). This rule applies at least where the party has had an opportunity to challenge the decree on appeal, *see* C. Wright & A. Miller, *Federal Practice and Procedure*, § 2960 (1973), and when the order is not so vague that the party had no notice that its conduct would be considered contemptuous, *see International Longshoreman's Association,*

Union violated the decree by publishing a side notice adjacent to the notice required by the Board in the general circulation newspaper *El Nuovo Dia.* Second, the Union is accused of having threatened violence and other reprisals against two employees if they continued to work as strike replacements during a Union-sponsored strike at a service station.

### The Publication of the Side Notice

The facts concerning the Union's publication of a notice addressed "To All Workers" alongside the Board's required notice are not in dispute. The difficulty is in determining whether the side notice merely expressed political opinion protected by the First Amendment or whether its publication at the particular time and place contemptuously eviscerated the Board's lawful publication requirement.

The notice required by the Board and by this court essentially repeated the terms of the injunction. The notices proclaimed that the Union would refrain from violence and threats against any employees and from other violations of the protected rights of employees. As mentioned above, an important purpose of the notices was to reassure workers that they need no longer fear violence and threats from Union Nacional.

The side notice was published after warnings by Board officials that its appearance next to the required notice would be considered noncompliance with the orders. The side notice, which is set out in full in the appendix to this opinion, states that publication of the order is being made only because the Board and this court have required it. The government's motivation is ascribed to involvement in an "anti-labor conspiracy". The Union asserts that the Board and the court have no jurisdiction to "dictate such orders", and that the orders violate the constitutional rights of the workers to organize and strike. The Union

then proclaims its "unyielding commitment" to the defense of these rights. Finally, the Union's broadside calls on workers "to repudiate" what amounts to the labor laws of the United States.

In evaluating the character of the side notice we begin with the wise observation of the Supreme Court that expressions of opinion in a labor context must be comprehended in light of the natural tendency of employees "to pick up intended implications . . . that might be more readily dismissed by a more disinterested ear." *N. L. R. B. v. Gissel Packing Co., Inc.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). Bearing this admonition in mind, we ask what are the "rights" to which the Union avows its "unyielding commitment". Because the context clearly implies that these "rights" are those impinged by the adjacent order forbidding the use of violence, threats and coercion, we think it plain, even after discounting the proclamation for a certain amount of face-saving bravado, that the Union is telling workers that it will continue to use these illegal means to further what the Union perceives to be the interest of the workers. This interpretation is reinforced by the Union's concluding call for "repudiation" of American labor laws. In short, the side notice tells workers that the orders of the Board and of the court are illegitimate and will not be obeyed.

■ Participants in labor disputes have a clear right to express opinions on Board orders, Board supervised settlements and labor affairs generally. *See e. g., Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The Board's requirement that a party publish a dictated order does not deprive the party of the right contemporaneously to express opinions on issues addressed by the required notice. Thus, in *N. L. R. B. v. Teamsters and*

---

*Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). Neither exception is even arguably involved in this case.

Second, this court has already ruled that this broad order is proper because of the Union's

"persistent attempts to interfere with legislatively protected rights by varying methods". *N. L. R. B. v. Union Nacional de Trabajadores, supra,* 540 F.2d at 11. We see no reason to reopen consideration of this issue.

*Chauffeurs Union, Local 627*, 241 F.2d 428 (7th Cir. 1957), a union was held not in contempt of a decree when contemporaneous with posting and mailing a notice required by a court-approved consent decree stating that the union would cease and desist from certain practices, the union posted and mailed a letter denying that the practices were illegal, claiming to accept the settlement only because it was favorable to the union, and promising to exercise full rights allowed by the Taft-Hartley Act. The court, referring to the union's privileges under the First Amendment and the labor laws themselves, wrote, "[A] limitation upon the privilege can be tolerated only where such speech or expression is intended or calculated to produce some result illegal under the Act, such as restraint or coercion." 241 F.2d at 432. *See also Edward G. Budd Manufacturing Co. v. N. L. R. B.*, 142 F.2d 922, 926–27 (3d Cir. 1944). Despite the court's broad protection of side notices, it should be noted that the union's letter in no way contradicted the notice.

■ Despite the Seventh Circuit's formulation, courts have not found it easy to maintain a bright line between privileged and contemptuous side notices. In *News-Texan, Inc. v. N. L. R. B.*, 422 F.2d 381 (5th Cir. 1970), the court found noncompliance with a settlement agreement when the side notice "was calculated to decimate the crucial terms of the settlement." 422 F.2d at 385. There, the required notice was intended to reassure employees, and the court felt that the employer's statement that the settlement agreement was meaningless had "destroyed [the notice's] substance and purpose." *Id.* While we are concerned about

the vagueness of the standard used by the *News-Texan* court and express no opinion on the propriety of that decision on its own facts, we read the case as standing for the salutary principle that publication of a side notice may so contradict the terms of the Board's required notice as to cancel the legitimate purpose of the required notice and amount to noncompliance with the notice order. Such a side notice, although not calculated to produce a result illegal under the Act, is itself unlawful under the order.[2]

■ From the foregoing, we think it is clear that Union Nacional's side notice destroyed the substance and purpose of the required notice. The side notice here expressed the Union's intention to threaten and use violence in the future, even if it did not itself threaten or harm and thereby create a result illegal under the Act. The Union clearly told the workers of Puerto Rico that it would not obey the lawful orders of the Board and this court when we directed it to state that it would obey these orders. We think this was contempt.

■ This holding does not abridge the Union's freedom of speech. The Union may publicly disagree with the wisdom of Board or court actions; it may urge that the laws be changed; it may castigate our motives or our sense. What will not be tolerated or protected are statements made in a given time and place that express determination to continue patently unlawful conduct when we have ordered the speaker to notify interested parties that it will abjure illegal practices.[3]

2. *See also West Texas Utilities Co. v. N. L. R. B.*, 92 U.S.App.D.C. 224, 228, 206 F.2d 442, 446 (D.C.Cir. 1953); *N. L. R. B. v. Trojan Powder Co.*, 135 F.2d 337, 340 (3d Cir. 1943). These cases concluded that a side notice had vitiated compliance with a Board notice requirement when the overall effect of the communication left the reader "with quite a different impression" than what would be given by the Board's notice standing alone. It should be noted that our holding need not be so broad, for here we have a disavowal of the message contained in the required notice.

3. *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 616–20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), is not to the contrary. There, the court held that employer comments on unionization cannot be the subject of an unfair labor practices proceeding, consistent with the First Amendment, unless the comments constituted threats of reprisals or promises of benefits. *Gissel* did not involve court or Board ordered notice and we think that such orders place a greater legal burden on the Union to refrain from contradictory comments in certain contexts.

### Threats Against Employees

The second episode of alleged contemptuous conduct involves threats by Union members directed at employees attempting to work during a Union-sponsored strike at Servacar de Puerto Rico, d/b/a Esso Service Station, in Villa Carolina. We accept the special master's findings of fact about this incident because after a careful review of the record we have concluded that they are not clearly erroneous. *See United States v. S. Volpe & Co., Inc.*, 359 F.2d 132, 134 (1st Cir. 1966).

The strike began in March, 1978, after months of unsuccessful bargaining over a new collective bargaining agreement. Thereafter, Servacar found it impossible to replace striking employees. Minor unexplained property damage had occurred at the station. Ubarri, a supervisor of Company service stations, contracted with a security firm, Security Associates, to provide two men to both pump gas and report threats to persons and damage to property.

The first man, Caban, arrived for work on the morning of June 7. Two striking Union members, Matos and Santiago, who had been standing on a nearby picket line, approached Caban and inquired whether he was going to work at the station. When Caban replied affirmatively, Matos asked him to cooperate with the strike and told him that a former replacement employee who had not cooperated had been beaten up, that the same would happen to him and that they could wait for Caban to leave work and attack him then. The conversation then ended. Caban left work without incident when his shift ended.

The second man, Carbrera, arrived to begin his shift. Union organizer Merle and the two striking employees soon approached Carbrera and asked him not to work because of the strike. When Carbrera answered that he needed the job, Merle warned that if Carbrera worked at the station, the strikers would not be responsible for anything that happened to him. The three Union members then returned to the picket line.

At about 2:30 p. m., a customer drove his car up to the gasoline pumps and Carbrera began to serve him. The three Union members walked toward Carbrera; Matos and Santiago carried large broken pieces of wooden two-by-fours in a raised position. The station manager, Tomassini, stepped in front of Carbrera and acceded to Merle's demand that he, rather than Carbrera, pump the fuel. As the strikers returned to the picket line, Matos and Santiago still holding the sticks over their shoulders, Merle warned Carbrera: "If you keep working here you're going to have problems."

Carbrera telephoned his supervisor at Security Associates, Nieves, informed him of the recent events and asked for protection. Soon Nieves and two other Security Associates employees drove into the service station. Nieves requested gasoline and Carbrera began to work the pump. The strikers approached the pump, now not carrying any sticks. Merle demanded that Carbrera not pump gas, Nieves insisted that he do so, and a small shoving match between the two men ensued. The police were called and soon arrived. After questioning Carbrera and station manager Tomassini, the police arrested Matos and Santiago. At a probable cause hearing held that afternoon, the judge found probable cause to believe that an assault had been committed and bound over the two defendants for trial.

As Carbrera was leaving the courthouse after the hearing, Union Secretary Romero approached him and told him that he was "going to get fucked." A police officer overheard Romero's threat and cautioned him that if anything should happen to Carbrera, the officer would come looking for Romero. Romero laughed at the officer's remark.

On two subsequent occasions, Matos threatened and hurled obscenities at Caban while the latter was working at the service station. The police were called on one occasion. The strike was settled in July and Union members returned to work at the station. The assault charges against Matos and Santiago were dropped.

The special master found that the Union members named above in relation to the incidents involving Servacar acted on behalf of and as agents of the Union. The Union does not dispute this finding.

■ On the basis of the above facts the special master concluded that the Union had willfully threatened two employees and should be held in contempt. We agree. The Union has engaged in the precise conduct forbidden by our decree: threatening employees who did not wish to follow the Union's dictates.

■ The Union argues in opposition that its members engaged in nothing more than picketline rhetoric when confronted with an attempt to break a long and gruelling strike. Threats of violent reprisals, however, are not tolerable picketline demagoguery. This is especially true in this case where we are not considering isolated remarks by members of a heretofore law-abiding Union which are the subject of an original unfair labor practices proceeding. Rather, we deal with conduct that is an unendurable continuation of threats and coercion by a Union that has amply demonstrated its disregard for the rights of employees.

■■ The Union further argues that Caban and Carbrera were not true employees of Servacar, but agents of Security Associates, and that, therefore, threats directed against them fall outside the prohibitions of the orders and the Act. The special master made no finding on this issue, believing that a finding that the two men were technical employees of Servacar was unnecessary. We think the special master was correct in this conclusion. The two men were hired by Servacar to pump gas and did so. They were also supervised by Security Associates and required to report on property damage and other illegal activity. They were not hired to interfere with legitimate union activity, but to keep the business operating during a tense and potentially violent strike when the Company could not hire regular employees. *Cf. N. L. R. B. v. Southwire Co.*, 429 F.2d 1050 (5th Cir. 1970)

(undercover surveillance of union activity held to be unlawful). An "employee" within the meaning of the Act need not be in a technical employer-employee relationship with any particular employer to receive protection from threats and coercion. *See Hudgens v. N. L. R. B.*, 424 U.S. 507, 510 n.3, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Phelps Dodge Corp. v. N. L. R. B.*, 313 U.S. 177, 192, 61 S.Ct. 845, 85 L.Ed.2d 1271 (1941); *John Hancock Mutual Life Ins. Co. v. N. L. R. B.*, 89 U.S.App.D.C. 261, 263, 191 F.2d 483, 485 (D.C.Cir. 1951). We think that it is enough that the Union threatened workers to coerce them not to work at tasks customarily performed by Union members during a Union-sponsored strike. There is no indication in the record that the Union members even knew that the two men were also security agents, and we see no reason for the Union to escape from the consequences of its contumacious conduct because of an irrelevant technicality. Finally, the language of the orders offers no relief to the Union: it forbids threats against the employees of any employer in Puerto Rico.

■ The Union also argues that the Board is estopped from seeking a contempt order against them because the Regional Director approved withdrawal of § 8(b)(1)(A) charges against the Union after a private settlement between the Company and the Union. The Union, however, did not raise this issue before the special master and the Board here denies they have approved withdrawal of the unfair labor practices charge. Because the Union did not raise the issue at a time when facts could be found, we must hold against them and presume that the Board did not approve withdrawal of the charges.

■ This leaves us only with the Company's withdrawal of charges after concluding a settlement agreement. We do not see how a private settlement can prevent the Board from seeking a contempt order when it is clear that an interested private party cannot initiate proceedings for a contempt order based on a prior, enforced Board order. *See Amalgamated Utility Workers v. Consolidated Edison Co.*,

309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738 (1940). In *International Union United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO, Local 283 v. Scofield*, 382 U.S. 205, 221, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965), the court wrote that this special deference to the Board is based on "the Board's expertness in achieving compliance with orders". We think the same rationale supports hearing the Board's charge of contempt even when the private dispute has been settled. Moreover, when the Board seeks compliance with a previous order it is not merely vindicating the interests of the parties injured by the contumacious conduct, but is seeking to prevent the recurrence of unlawful behavior that has already injured the interests of numerous other parties. The Board's pursuit of this public interest should not be prevented by an agreeable adjustment of private affairs. *See, e. g., Local 98, United Association of Journeymen, Etc. v. N. L. R. B.*, 497 F.2d 60, 65–66 (6th Cir. 1974).

### Remedies and Purgation

■ The special master made a detailed recommendation of remedial obligations to be placed upon the Union for them to purge themselves of contempt. Under the master's recommendations the Union essentially must: obey the previous order, repeat the full publication requirement contained in that order without impairing such notice by inclusion of the offending side notice; and pay all the Board's costs for bringing this suit, including attorneys' salaries. The Union has made objection to several parts of the proposed remedies, attempting to characterize them as punitive. We think this objection is frivolous. Union Nacional has, as the special master remarked, an unenviable record of deliberate defiance of the Board, this court and the law. The remedies proposed are a reasonable effort to eliminate the effects of the Union's contemptuous conduct and assure that it will now obey our decree. Thus, we adopt the special master's recommendations, and hereby order that:

> Union Nacional de Trabajadores, its officers, agents and representatives, and Arturo Grant, are required to purge themselves of their past contumacious conduct by:

> 1. Fully complying with and obeying this court's decree of June 21, 1976, and refraining from any action or inaction which would constitute committing, engaging, inducing, encouraging, permitting or condoning any violation of the said decree.

> 2. Ceasing and desisting from restraining or coercing employees in the exercise of their rights guaranteed by Section 7 of the Act by threatening violence directed against such employees or in any other manner restraining or coercing employees in the exercise of their Section 7 rights.

> 3. Immediately re-publishing in the Puerto Rican newspaper *El Nuevo Dia*, at their own expense, the notices required to be posted by the court's June 21, 1976, decree without the side notice found violative by the court's adjudication herein.

> 4. Immediately posting in conspicuous places at the Union's business offices, including all places within its jurisdiction where notices are customarily posted, for a period of sixty (60) consecutive days, copies of the contempt adjudication and an appropriate notice, in both English and Spanish, in the form to be supplied by the Board and signed by an officer of the Union, and by Arturo Grant individually, which states that the Union and Grant have been adjudicated in civil contempt of this court for violating and disobeying and failing and refusing to comply with this court's judgment, and that the Union and Grant will undertake forthwith the action ordered in purgation, said notices, together with a copy of the contempt adjudication, to be maintained in clearly legible condition throughout such posting period, and insuring that they are not altered, defaced, or covered by any other material; and reading said notice, in both English and Spanish, by an appropriate officer of the Union at a general meeting of the membership.

5. Signing and mailing sufficient copies of said notice to the Regional Director for the Twenty-Fourth Region, for posting at the offices and installations of the involved employers, if such employers be willing.

6. Forthwith publishing said notice, at respondent Union's expense, in all newspapers of general circulation published in Puerto Rico and in any newspaper of respondent Union, in each case in the language in which the newspaper is printed.

7. Filing separate sworn statements with the Clerk of this court and copies thereof with the Regional Director of the Twenty-Fourth Region of the National Labor Relations Board in writing within fifteen (15) days after the entry of adjudication, and again upon termination of the posting period, showing that steps have been taken by the Union and Grant to comply with this court's directions.

8. Reimbursing the Board for all its expenses, including attorneys' salaries, and all costs and expenditures incurred in the investigation, preparation, presentation, and final disposition of this proceeding to adjudge the Union and Arturo Grant in civil contempt, said amounts, unless agreed upon, to be established by the court upon submission by the Board of an itemized bill of costs.

■ The special master also recommended to the court that it impose prospective compliance fines on the Union to deter future violations of the decree. We think that such a compliance mechanism is necessary in this case of unusual intransigence by a party and therefore order that Union Nacional be fined $10,000 for each and every future violation of the decree and $1,000 per day for each day such violation continues. Further, an additional compliance fine will be exacted from Union president Grant of $1,000 for each violation and $500 per day so long as that violation continues.

*It is so ordered.*

## APPENDIX

The following is the side notice published on September 9, 1977 in *El Nuevo Dia* by Union Nacional de Trabajadores and signed by Union President Arturo Grant:

*"TO ALL WORKERS*

"On this same date the undersigned, as president of Union Nacional de Trabajadores, has submitted four notices to employees and members of the Union. The same are the result of an order of the United States Court of Appeals for the First Circuit, and we have been required to sign them to be published in edicts that will appear in newspapers of general circulation, on bulletin boards of the Union and of the work centers included in the orders and by individual mailings to each of the workers of each of the companies mentioned in the different orders.

"Hereby I state to all the workers of Puerto Rico on behalf of and by mandate of the Board of Directors of our Union, that the signing and publication of the referred-to orders are the result of a unilateral imposition on the part of the National Labor Relations Board of the United States and of the United States Court of Appeals for the First Circuit, due to the militancy and combativeness of this Union displayed against the imposition of the Board and the employers. That they are part of an anti-labor conspiracy directed at restraining the development of the labor work we are carrying out in defense of the interests of the fellow affiliates of this Union. That Union Nacional de Trabajadores has challenged and continues to challenge the jurisdiction of the National Labor Relations Board of the United States and of the United States Court of Appeals for the First Circuit to dictate such orders; that we understand that such orders are illegal insofar as they impair the Puerto Rican workers' constitutional right to become organized, collective bargaining, picketing and striking. That our loyalty and unyielding commitment is with the defense of those rights and the full exercise thereof by the workers unionized with Union Nacional and all Puerto Rican workers.

"The workers of Union Nacional call on all Puerto Rican workers to join forces in the determination to repudiate the laws, regulations and anti-labor practices reflected in the Taft-Hartley Act, and the regulations established by the National Labor Relations Board of the United States."