**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 282, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.**

**Docket 29149.**

United States Court of Appeals, Second Circuit.

May 18, 1970.

Hans J. Lehmann, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul Elkind and Seth D. Rosen, Attys., N.L.R.B., Washington, D. C., for petitioner.

Cohen and Weiss, New York City (Bruce H. Simon, New York City, of counsel), for respondent.

Before WATERMAN, SMITH and ANDERSON, Circuit Judges.

WATERMAN, Circuit Judge:

In 1965 this court, as the result of an illegal secondary boycott by Local 282 of the International Brotherhood of Teamsters, broadly enjoined Local 282 from engaging in any more such boycotts in the future.[1] 344 F.2d 649. We stated that "We are of the opinion that an order of this scope was justifiable in view of the union's likely future violations of 8(b) (4) (B)." *Id.* at 653. On September 30, 1968, the National Labor Relations Board filed an original motion with us seeking to have Local 282 held in civil contempt for staging four secondary boycotts in violation of the injunction. The union denied the prohibited conduct and interposed several legal defenses. We then appointed Hon. Richard H. Levet, United States Senior District Judge, as a Special Master to hold hearings, to take testimony, and to make findings of fact in the premises. The Special Master, after giving the parties opportunities to file requests for findings of fact and conclusions of law, filed his report and his suggested conclusions of law. He has found that the union had violated the injunction in three of the four instances that the Board had charged. From this report both parties take exceptions.

■■■ We hold at the outset, contrary to the union's assertion, that this court's injunction forbidding the union to engage in future secondary boycotts is an enforceable injunction. We so hold on alternative grounds. First, we hold that the union's challenge to the validity of the injunction on the ground that it is overbroad is barred by *res judicata*. To the best of our knowledge, the question whether a party cited for civil contempt may in that proceeding collaterally attack the validity of the permanent injunction he is claimed to have violated presents a case of first impression. As has been stated in one Note,

Almost no case law exists in [this area] for a simple reason: if the enjoined defendant appeals and his case is pressing, he will often be able to have the injunction stayed by supersedeas, if the appeal itself does not automatically stay it; if he cannot make the showing necessary for a stay, he is unlikely to risk a contempt citation by violating the injunction; thus, the situation only arises when a defendant

---

1. The union was ordered to:
 1. Cease and desist from:
 (a) Engaging in, or inducing or encouraging any individual employed by James Thompson & Son, Inc., Road Material Corporation, Exner Corporation or any other person engaged in commerce or in an industry affecting commerce, to engage in a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or threatening, coercing or restraining Thompson, Road, Exner, or any person to cease using, selling, handling, transporting or otherwise dealing in the products of or to cease doing business with Cleveland General Transport Co., Inc., or other persons.

violates the injunction without bothering to appeal. Note, Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1080 (1965).

Two cases, however, have held that a defendant in an action of criminal contempt is estopped from contesting the validity of a permanent injunction from whose issuance he took no appeal. Bullock v. United States, 265 F.2d 683, 690 (6 Cir.), cert. denied, 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959); Jennings v. United States, 264 F. 399, 403 (8 Cir. 1920). We recognize that a party facing charges of civil contempt has a right to challenge the validity of a temporary injunction which he violated whereas a party facing charges of criminal contempt does not. See United States v. United Mine Workers, 330 U.S. 258, 294-295, 67 S.Ct. 677, 91 L.Ed. 884 (1947). However, where, instead of a temporary injunction, a permanent injunction is violated, the interest in enforcement consists not only of the need to maintain respect for court orders and for judicial procedures, but also of the need to avoid repetitious litigation. This latter interest, the interest which the doctrine of *res judicata* serves in all of its applications, militates in favor of barring collateral attacks upon permanent injunctions in civil contempt proceedings as well as in criminal ones. Here Local 282 could have sought review of the breadth of the injunction we issued by a petition for a rehearing, by a petition for a writ of certiorari, or conceivably by a petition for a writ of prohibition. These remedies do not appear to have been attempted and, of course, the litigation of issues which have been or could be litigated in a given case should reach repose when final judgment in that case is entered.

■ Alternatively, even if relitigation of the issues were not barred by *res judicata*, we hold that the injunction we issued was a valid one. Contrary to the union's assertion, the injunction is not void for overbreadth. The Supreme Court pronounced the standard for judg-

ing the permissible breadth of an injunction in labor cases as follows:

> The breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the [party] in the past. NLRB v. Express Publishing Co., 312 U.S. 426, 436, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

Since the *Express Publishing* case the courts have upheld injunctions forbidding acts against unnamed persons so long as, at the time the injunction issued, there was reason to fear that future violations would result from a pattern or plan of illegal activity already instituted. See, e. g., McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949); NLRB v. Milk Drivers, etc., Local Union No. 584, 341 F.2d 29 (2 Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965); NLRB v. Local 294 etc., 298 F. 2d 105 (2 Cir. 1961); NLRB v. Sun Tent-Luebbert Co., 151 F.2d 483 (9 Cir. 1945), cert. denied, sub nom. Merchants & Manufacturers Ass'n of Los Angeles v. NLRB, 329 U.S. 714, 67 S.Ct. 44, 91 L.Ed. 620 (1946). In those cases where injunctions have been found overbroad, it has been held that there was no evidence that the enjoined party had proceeded in the past or would proceed in the future to violate any labor rights other than those of the particular parties named in the decree. See, e. g., Communications Wkrs. of America, AFL–CIO v. NLRB, 362 U.S. 479, 80 S. Ct. 838, 4 L.Ed.2d 896 (1960); NLRB v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941); International Brotherhood of Teamsters, etc., Local No. 554 AFL–CIO v. NLRB, 262 F.2d 456 (D.C.Cir. 1958).

In this case we found in our previous opinion, 344 F.2d 649, 652 (2 Cir. 1965), on adequate evidence, that Local 282 was

an "incorrigible secondary boycotter" and that it was likely to commit future violations of Section 8(b) (4) (B). This finding is sufficient to meet the requirements of *Express Publishing Co.* Despite this, the union argues that there must be a showing that it has a scheme to violate the rights of a contractually related group of employers before it can be broadly enjoined, cf. NLRB v. Milk Drivers, etc., Local Union No. 584, 341 F.2d 29 (2 Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965). We find no such rule in the cases or in the congressional policy. Unless broad injunctions of this sort are permissible, an unscrupulous union can continue with relative impunity to use illegal coercion against employers. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

The union also advances the ancillary argument that this court possessed no reliable evidence that Local 282 was an "incorrigible secondary boycotter" at the time this court issued its injunction. The judgments cited in the opinion,[2] 344 F.2d 649, 652–653, in which Local 282 had previously been found guilty of secondary boycotting, included consent judgments in two instances. The union contends that a court cannot rely upon a history of consent decrees to justify the issuance of an injunction of the scope of the one we issued.

■ We do not agree that this court, in issuing its injunction against Local 282, only used facts inferable from consent judgments for purposes of collateral estoppel. Of course as a usual rule such a use of consent judgments, unless based upon factual findings or stipulated facts, is undesirable and impermissible, see, generally, 1–B Moore's Federal Practice ¶0.333[3] (1965); Note, The Consent Judgment as an Instrument of Compromise and Settlement, 72 Harv.L.Rev. 1314, 1320–1321 (1959).

Moreover, both the NLRB and the courts have held on occasion that facts not otherwise established except by a consent judgment itself will not adequately establish a proclivity for unlawful action so as to justify a broad injunction prohibiting such action. See NLRB v. Local 926, International Union of Operating Engineers, 267 F.2d 418 (5 Cir. 1959); Teamsters' Local 327 (Greer Stop Nut Co.), 160 N.L.R.B. 1919 (1966); Local 92, Int'l Ass'n of Bridge, etc. Workers (R. N. Hughes Constr. Co.), 138 N.L.R.B. 428, 429 n. 2 (1962). In those cases, indeed, there were no findings of fact apart from the consent decrees themselves, decrees which contained nonadmission clauses, to indicate that the prohibited activity had indeed occurred previously. In the present case the consent decrees in all of the cases relied upon by us when we issued the injunction were entered only after a trial examiner and the NLRB had in each case found from evidence adduced at hearings that unfair labor practices had occurred. Such findings, even though not affirmatively reconfirmed or confessed by Local 282 in this court, are perfectly adequate to demonstrate Local 282's proclivity to engage in secondary boycotts.

■ The union contends that the NLRB is obligated to seek injunctive relief against a specific unfair labor practice pursuant to Section 10(*l*) of the N. L.R.A. before it can initiate contempt proceedings. We disagree. The injunction previously issued by this court, which the NLRB invokes, adequately prohibits the kinds of acts which the NLRB alleges to have occurred and no more specific injunction was necessary. See McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

■ The union argues that the secondary boycott provisions of the law are

2. Teamsters Local 282, 137 N.L.R.B. 858 (1962), enforced by consent decree, No. 27765 (2 Cir. Jan. 18, 1963) ; Teamsters Local 282, 139 N.L.R.B. 1077 (1962), enforced by default judgment, No. 28608 (2 Cir. Apr. 21, 1964) ; Teamsters Local 282, 141 N.L.R.B. 424 (1963), enforced by consent decree, No. 29031 (2 Cir. Jan. 12, 1965).

complex and that civil contempt proceedings should not be resorted to where the application of this complex law is doubtful. Apart from the fact that the application of the law in this case is no more doubtful than in many other contempt cases upon which the courts sit, we observe that a violation need not be wilful for a party to be found in civil contempt. McComb v. Jacksonville Paper Co., *supra*.

The requirements of Section 8(b) (4) (i) (ii) (B) [3] have been amplified by the courts. In Local 761; Int'l Union of Electrical Workers etc. v. NLRB (General Electric Co.), 366 U.S. 667, 681, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), the Court stated that, for a secondary employer to isolate itself from the employer with whom a union has a primary labor dispute, the following criteria must be met: "There must be a separate gate marked and set apart from the other gates; the work done by the men who use the gate must be unrelated to the normal operations of the employer and the work must be of a kind that would not, if done when the plant were engaged in its regular operations, necessitate curtailing those operations." So long as such a gate is used exclusively by employees of the secondary employer, *General Electric* indicates that picketing of that gate will be interpreted as an attempt to persuade the secondary employees to strike or to persuade tertiary employees to refuse to cross the line, thus illegitimately coercing the secondary employer to cease doing business with the primary employer until the primary employer's dispute with the union shall have been favorably concluded. Where employees of the primary employer are present on the site used by the secondary employer, however, picketing is permissible under limitations set forth in Sailors Union of the Pacific (Moore Dry Dock Co.), 92 N.L.R.B. 547 (1950), requiring:

(1) that the picketing be limited to times when the situs of dispute was located on the secondary premises,

(2) that the primary employer be engaged in his normal business at the situs,

(3) that the picketing take place reasonably close to the situs, and

(4) that the picketing clearly disclose that the dispute was only with the primary employer

(quoted from *General Electric, supra* at 677). Unlike the Special Master, we do not necessarily find a requirement that there be no other location at which the primary employer may be picketed, but we do not find the existence or nonexistence of such a requirement critical in the decision of this case.

We now turn to the NLRB's specific allegations of a secondary boycotting by the union in violation of the injunction. Both parties and the Special Master agree that clear and convincing proof is needed in order to find a party

---

3. § 8(b) It shall be an unfair labor practice for a labor organization or its agents—

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce, to engage in a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object is—

\* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of his employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

in contempt. See, e. g., NLRB v. Standard Trouser Co., 162 F.2d 1012, 1014 (4 Cir. 1947). Applying that standard of proof, we affirm the Master's conclusions as to each of the incidents alleged.

### Hofstra University, The Howell Construction Site

On June 21, 1968, Local 282 demanded that Hofstra University on Long Island recognize it as the bargaining representative of truck drivers working for the Building and Grounds Department of the University. In support of this demand the union struck and picketed the various entrances to the campus from June 21 until early August 1968. Two other unions were simultaneously picketing these entrances in furtherance of a strike over wage demands.

The secondary boycott allegations arising from Local 282's activities at Hofstra focus on two different locations. The first is the Internal Revenue Service Training Service Center Building, a new structure being erected on Hofstra's east campus. The construction was done by the E. W. Howell Company, an independent contractor. The Master found that the construction site was enclosed on three sides by a temporary fence and on the fourth side by a permanent fence, so that the only means of entrance to the project was through a gate clearly marked for the exclusive use of Howell employees.

On June 24, 1968, Local 282 began picketing the Howell gate with signs bearing the union's name and the message "Hofstra on Strike." This picketing continued until the end of July 1968, although it did not occur on each and every day and it did not always last a full day when it did occur. The Special Master found that the business manager of Local 282, Tony Bai, appeared at the Howell gate almost daily. He spoke to truck drivers who were about to bring building materials through the gate and, after these conversations, the trucks would turn away. Because of the picketing Howell could not get sufficient deliveries to carry forward the construction and the project was shut down from July 16 until early August.

The Special Master found that the purpose of the picketing by Local 282 was to force Howell to cease doing business with the primary employer, Hofstra University, thus enmeshing Howell, a neutral party, in the union's dispute with the University. He found that construction of the Internal Revenue Service Building was a capital improvement to the University's physical plant, and that, as such, the construction was unrelated to the University's normal service operations or normal plant maintenance. Moreover, the Special Master found that the Howell gate was not used by employees of Hofstra, by students, or by the general public. Consequently, the Master's report concludes that the picketing of the Howell gate by Local 282 constituted an illegal secondary boycott which violated the injunction.

 The union alleges that there are several errors in the report. First of all, it contends that the Internal Revenue Service Training Center was an integral part of Hofstra's normal educational activities, so that the picketing of the Center's construction site was lawful direct picketing of the primary employer. We disagree. In the *General Electric* case, *supra*, the Supreme Court made clear that "construction work on new buildings," as well as other "work of a capital improvement nature," when performed by an independent contractor, could not be considered work performed by the primary employer itself. 366 U. S. at 669, 81 S.Ct. at 1287. Here, Howell was clearly engaged in improving the capital plant of Hofstra, "the work done by the men who use the gate [was] unrelated to the normal operations of the employer and the work [was] of a kind that would not, if done when the plant was in its regular operations, necessitate curtailing those operations." 366 U.S. at 681, 81 S.Ct. at 1294. As the Special Master pointed out, the business of Hofstra was not the business of erecting new buildings. It is irrelevant for purposes of the test set forth in *General*

*Electric, supra,* that these buildings would eventually be used for educational purposes.

The union next argues that, contrary to the Master's finding, the Howell gate was frequently used by Hofstra students and employees, so that the gate was a common situs used by the primary as well as the secondary employer, and therefore the union maintains that its picketing would be privileged as long as it, *inter alia,* made clear to all would-be users of the gate that its dispute was with the primary employer and with no one else.

We agree with the Master that the National Labor Relations Board has produced clear and convincing proof that, with de minimis exceptions, the gate was not used by University students and employees but was used exclusively by Howell personnel. The union points to testimony that Hofstra's security vehicles occasionally passed through the gate and that Hofstra's coordinator of campus planning and construction occasionally visited the site. However, the fact that the primary employer maintains certain minimal contacts with the independent contractor, such as checking the site for security purposes, or visiting it to keep informed of construction progress, does not undermine the exclusivity of the site. The Special Master was correct in ruling these contacts de minimis. In this connection we also affirm the Master's conclusion that Louis Jensen, an architect who occasionally visited the Howell construction job, was self-employed, and was not an employee of Hofstra University. We find irrelevant the observation of the union that the temporary fence on one side of the Howell site was occasionally removed in order to give trucks access to the football stadium where another independent contractor was also performing capital improvement work. Even if they were relevant, the trips were so infrequent as also to be de minimis; according to reliable testimony the fence was generally in place.

Finally, the union attacks the evidence offered by the Board to the effect that union pickets were instrumental in turning trucks away from the Howell site. To the contrary, there was substantial evidence that union personnel spoke to the drivers of incoming trucks and that many trucks refused thereafter to enter the site. Indeed, the Special Master was warranted in finding clear and convincing proof that there existed a cause and effect relationship between these events.

We therefore hold that the union violated our injunction by its picketing at the Howell gate.

### Hofstra University: The Youngdahl Construction Site

On June 22, 1968, Local 282 began picketing a project where C. E. Youngdahl and Company, Inc., a general building contractor, was constructing two dormitory buildings for the future use of Hofstra students. Over the union's objections we agree with the Master that Youngdahl, like Howell, was an independent or secondary employer and that the work done on the Youngdahl site cannot be attributed to Hofstra, nor that the picketing forced curtailment of work normally done by Hofstra. Again, Hofstra is not and was not in the construction business. The dormitories, like the Internal Revenue Center, were capital improvements to Hofstra's physical plant. Moreover, Youngdahl's contract was not even with Hofstra but was with the Dormitory Authority of the State of New York.

Youngdahl did not mark its gate as unequivocally reserved to its exclusive use until July 1, some nine days after the commencement of picketing. However, for the duration of the picketing the gate was clearly reserved for the contractor's exclusive use, and the contractor's failure to reserve the gate immediately did not compromise the effectiveness of the later reservation. See Local 36, International Chemical Workers Union (Virginia-Carolina Chem. Corp.),

126 N.L.R.B. 905, 910 (1960), enf. 47 L. R.R.M. 2493 (D.C.Cir.), cert. denied, 366 U.S. 949, 81 S.Ct. 1901, 6 L.Ed.2d 1243 (1961).

The union argues that the Youngdahl gate was in fact used by Hofstra students and employees, so that the gate was reserved only in name and not in fact. To support this contention, the union relies on the testimony of union members Marino Abbondondolo, Patrick Doherty, James Keller, and Howard O'Britis. The Special Master explicitly refused to credit the testimony of these witnesses on this issue, and instead relied on the testimony of C. E. Youngdahl and Richard Fredholm, Youngdahl's superintendent, to find that any use of the Youngdahl gate by Hofstra students and employees was de minimis. Although it is obvious that Youngdahl and Fredholm were perhaps unable to observe the gate at all times, the Master also found the testimony of the union's witnesses relative to the use of this gate conflicting and contradictory. Where there is conflicting testimony, the Master's determinations of credibility will be respected by the appellate court. See NLRB v. Standard Trouser Co., 162 F.2d 1012 (4 Cir. 1947). The fact that the gate was not guarded does not destroy the Master's conclusion that it was adequately reserved. Though we entertain lingering doubts as to the Master's conclusion that even if students had entered the gate in large numbers it would not have been proper for the union to picket in order to discourage them from doing so, we see no need to reach that question.

The Special Master also found that even if the Youngdahl gate was not reserved to the contractor—and we assume that between June 22 and July 1 it was not—the union was still guilty of a secondary boycott. The evidence indicates that the pickets turned away trucks delivering building material even though none of the material was destined for the University, but was for use by Youngdahl. Under the *Moore Dry Dock* rules, described above, the union must disclose that its dispute is with the primary employer alone. The testimony of one union picket that he asked all drivers delivering material to the Youngdahl site to honor the picket line shows that the union was contradicting the very message which such disclosure is designed to convey. As a consequence the Master quite properly found that the purpose of this picketing was an illegal purpose and therefore the acts of picketing were illegal acts.

### The Sachem High School Project

The E. W. Howell Company was general contractor in the construction of the Sachem Senior High School. Delta Erection Company was a subcontractor. Miller-Letterman Corporation was a prime contractor for the installation of plumbing. Miller-Letterman received its supply of pipe and fixtures from the Anniston Foundry Company in Alabama. Local 282 commenced picketing the Sachem Senior High School site on September 5, 1968 during a time when it had disputes with both Howell and Delta.

During this picketing, on September 9, 1968, trucks from Anniston arrived at the site carrying pipe for Miller-Letterman. After speaking with representatives of the union, however, the trucks left the site without delivering the pipes. One of the drivers stated that he would not cross the picket line even though the strike was not against Miller-Letterman. Miller-Letterman then authorized delivery of the pipe for storage at another location, known as the Ward-Milville site, some ten miles away. However, the Master found that an officer of Local 282 informed Miller-Letterman by telephone that the pipe would not be unloaded at any place on Long Island. Men bearing Local 282 signs picketed the alternative site when the trucks went there and told the drivers that no trucks were allowed onto the site. The pipe was not delivered. As a result, the Special Master found that Local 282 was guilty of coercing an independent employer to cease doing business with

Howell and Delta, the primary employers in its dispute.

We believe that the Special Master was warranted in reaching this conclusion. The union argues that its picketing conformed to *Moore Dry Dock* standards in that its members indicated that their dispute was with Howell and Delta and not with Miller-Letterman, and it also argues that the Anniston drivers turned away of their own accord and without persuasion or coercion by Local 282. The union also contends that the pickets who appeared at the Ward-Milville site were not authorized to do so by the union, and that the alleged conversation in which a union member stated that the pipe would not be unloaded anywhere on Long Island was apocryphal inasmuch as the union member to whom the conversation was attributed produced a hotel bill to prove that he was in San Francisco at the time. The union states that the Anniston drivers refused to unload the pipe at the Ward-Milville site only because they had no proper bill of lading for that location.

We believe that the Special Master was warranted in inferring coercion solely from the fact that the Anniston drivers originally turned away from the Sachem site after speaking with union pickets there. Moreover, the Master was within the bounds of his fact-finding discretion in finding that the union members picketing at the Ward-Milville site were authorized by the union to do so, for no evidence was presented from union officials or from the members who did the picketing that they were not so authorized. Irrespective of whether the union pickets actively persuaded the Anniston drivers not to deliver to Miller-Letterman, their very presence at a site where they had no primary labor dispute was impermissible. See Brown Transport Corp. v. NLRB, 334 F.2d 30, 39 (5 Cir. 1964). In light of these conclusions, the Master's finding concerning the union officer's telephone conversation, stating that the pipe would not be unloaded anywhere on Long Island, even if erroneous, was harmless error.

*The Meadowbrook Project*

Lawrence J. Rice, Inc. was general contractor for a construction project at the Nassau County General Hospital, known as the Meadowbrook Hospital Complex. Among Rice's subcontractors were Island Pa-Vin Corporation and Ferran Construction Corporation. These two were the only subcontractors who employed more than one driver. On February 20, 1968, the business agent of Local 282 spoke with the project manager for Rice about the fact that Ferran employed drivers who did not belong to the Teamsters Union. On April 18, the business agent began to question all drivers entering the construction site. On the previous day, April 17, the business agent had stated to Rice that Ferran and Pa-Vin were employing "scab" drivers. From this time on no trucks made deliveries to the Meadowbrook project, and on April 23 the project was forced to close down. Ferran eventually signed a collective bargaining agreement. On April 29 the union abandoned its dispute with the other subcontractor employers and the project reopened on April 30.

As the union had a primary dispute with Rice at this time over an agreement by Rice restricting Rice's right to subcontract to companies with drivers not belonging to Local 282, the Special Master concluded that the union was not guilty of trying to force Rice to cease doing business with Pa-Vin and Ferran, because the union had a legitimate labor dispute with all three of the companies contemporaneously.

The Board on the other hand urges that even though the union did have a legitimate primary dispute with Rice, its primary purpose in picketing at the job site was the illegitimate purpose of attempting to force Rice to discontinue its present relations with Ferran and Pa-Vin. The Board argues that it is possible for picketing to be illegal despite the presence of a purpose which is, in and of itself, legitimate, NLRB v. IBT, etc., Local 294, 342 F.2d 18, 22 (2 Cir. 1965), and citing Northeastern Indiana Bldg. &

Constr. Trades Council (Centlivre Village Apts.), 148 N.L.R.B. 854, 857 (1964), enf. denied on other grounds, 122 U.S.App.D.C. 220, 352 F.2d 696 (D.C.Cir. 1965). However, we agree with the Special Master that here the evidence does not clearly and convincingly indicate that the primary dispute with Rice was not real, as it was in NLRB v. IBT, etc., Local 294, *supra*. Consequently, we do not find adequate evidence of any purpose to conduct a secondary boycott.

Having established that the Union violated our injunction in three of the four instances in which the National Labor Relations Board has charged that our injunction had been violated, we refer the case once again to the Special Master, Hon. Richard H. Levet, pursuant to Rule 53(a), Fed.R.Civ.P., to make recommendations as to the appropriate sanctions to be applied to the Union in each instance.