507 F.2d 170
 87 L.R.R.M. (BNA) 3197, 75 Lab.Cas. P 10,501
 CF&I STEEL CORPORATION, a Colorado Corporation, Plaintiff-Appellee,
v.
UNITED MINE WORKERS OF AMERICA, an unincorporated
association, Individually and as representative of
its members employed by Plaintiff, et
al., Defendants-Appellants.
 No. 74-1031.
 United States Court of Appeals, Tenth Circuit.
 Argued Aug. 21, 1974.
Decided Dec. 10, 1974.
 
 1
 Edward J. Scheunemann, Denver, Colo., for defendants-appellants.
 
 
 2
 Thomas G. Brown, Denver, Colo., for plaintiff-appellee.
 
 
 3
 Before HILL and McWILLIAMS, Circuit Judges, and TALBOT SMITH,* Senior District Judge.
 
 
 4
 TALBOT SMITH, Senior District Judge.
 
 
 5
 The appellee herein is an employer, the CF&I Steel Corporation. It has obtained an injunction forbidding Local 9856 of the United Mine Workers of America, its officers and members (hereinafter the Union) from 'engaging in a strike, work stoppage, interruption of work, or picketing at the Allen Mine of the CF&I Steel Company at Weston, Colorado, over disputes arising from employee suspensions, employee discharges, and work assignments, during the remaining life of the National Bituminous Coal Wage Agreement of 1971.'[1] The Union appeals, arguing that the injunction is vague, overbroad, unsupported by the record, and 'violative of Federal labor law.'
 
 
 6
 The Allen mine, where on June 11, 1973, a forty-hour strike began, has suffered a series of labor-management controversies. The June 11 incident involved a group of miners who had left the mine before the end of their shift to attend the funeral of a fellow miner. The employees felt that they were entitled to 'portal-to-portal pay,' that is, pay from the time they entered the mine to the time they left. The company, on the other hand, took the position that they were entitled to pay only to the time when they left the 'face,' that is, the specific point where they were working within the mine.
 
 
 7
 The trial court, 372 F.Supp. 846, satisfied that the strike was in violation of the employment contract between the parties and that it presented a case for equitable relief, issued a temporary restraining order[2] halting the strike, accompanied by an order to show cause why preliminary injunction should not issue in accordance with the prayer of the complaint. Subsequent thereto, the parties stipulated that the hearing on the preliminary injunction be treated as the trial on the merits insofar as it related to the petition for injunctive relief. Fed.R.Civ.P. 65(a)(2).
 
 
 8
 Upon the trial it was established that since May of 1969 there had been eight wildcat strikes at the mine. The trial court's conclusions with respect thereto were that
 
 
 9
 We have found that six of the eight strikes have been in violation of the 1971 or the 1968 Agreement.[3] The issue of employee discharge or suspension was involved in three of the six, and disputes having to do with work assignments were involved in two. The issues of portal-to-portal pay, medical services, vacation pay, and hoistmen's pay arose once apiece. Because we do not find that these latter four issues are likely to recur, we conclude that no case for equitable relief has been established as to them. However, we do find that additional strikes over employee suspensions, employee discharges, and work assignments are likely to occur unless prohibited by order of this court.
 
 
 10
 The trial court heard testimony as to each of the eight strikes. As is usual in cases of this kind, there was evidence pro and con as to each, presenting in most instances questions of motivation, justification, fault and the applicability of the contract provisions. The Union specifically briefs and argues the merits of the June 11 strike, asserting in part that CF&I was attempting to modify the basic agreement with respect to portal-to-portal pay and hence the strike was not over a local arbitrable issue. The parties initially attempted to settle the issue through the grievance procedure which, however, had reached an impasse when the strike occurred. Upon this record it is clear that the strike, as the court held, was over an arbitrable grievance and was a violation of the 1971 Agreement. The court, in view of the above conclusions, properly finding irreparable damage unless future strikes as to three types of disputes were enjoined,[4] and that CF&I would suffer more from denial of injunctive relief than the Union from its issuance, ordered that 'Local Union 9856 of the United Mine Workers of America, the officers and members of Local Union 9856 of the United Mine Workers of America, and all persons acting in concert and participation with them, be and they hereby are restrained and enjoined from engaging in a strike, work stoppage, interruption of work, or picketing at the Allen Mine of the CF&I Stee Company at Weston, Colorado, over disputes arising from employee suspensions, employee discharges, and work assignments, during the remaining life of the National Bituminous Coal Wage Agreement of 1971.'
 
 
 11
 The Union attacks the decree on various fronts. It first argues that the injunction is impermissibly vague under Fed.R.Civ.P. 65(c). We do not find it so. '(A) decree is vague when the delineation of the proscribed activity lacks particularity,'[5] or when containing 'only an abstract conclusion of law, not an operative command capable of 'enforcement."[6] Here we find enjoined specific concerted activity, namely, 'strike, work stoppage, interruption of work, or picketing at the Allen mine.' These are terms of reasonably specific content in the 'common law of the shop.'[7] The situations, moreover, of applicability are spelled out; that is, 'over disputes arising from employee suspensions, employee discharges and work assignments,'[8] with respect to all of which areas, we note, strikes had occurred in the past and, the court found, were 'likely to (recur) unless prohibited by order of this court.' We find no incapacitating vagueness in the decree.[9]
 
 
 12
 The Union further challenges the scope of the injunction granted on the ground that it is too broad, relying on general principles of equity, the case of Boys Markets, Inc. v. Retail Clerks, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), and the Norris-La-Guardia Act, 29 U.S.C. 101-115.
 
 
 13
 The Supreme Court's standards for judging the permissible breadth of injunctions are found in NLRB v. Express Publishing Co., 312 U.S. 426, 436-437, 61 S.Ct. 693, 700, 85 L.Ed. 930 (1941).[10] It is there held that:
 
 
 14
 The breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past. * * * To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past.
 
 
 15
 Exemplification of these principles is found in NLRB v. Local 282, Teamsters, 428 F.2d 994, 999 (2nd Cir. 1970), wherein the court held:
 
 
 16
 Since the Express Publishing case the courts have upheld injunctions forbidding acts against unnamed persons so long as, at the time the injunction issued, there was reason to fear that future violations would result from a pattern or plan of illegal activity already instituted. In those cases where injunctions have been found overbroad, it has been held that there was no evidence that the enjoined party had proceeded in the past or would proceed in the future to violate any labor rights other than those of the particular parties named in the decree. Here it was the conclusion of the trial court, as we have heretofore set forth, after taking testimony as to eight strikes, that six of them were in violation of the 1971 or 1968 wage agreement, that past strikes, so violative, had occurred with respect to work assignments and employee suspensions and discharges, and that such were 'likely to occur unless prohibited by order of this court.' Thus, cases relied upon by the Union,[11] in which injunctions extending to wrongful acts which had not occurred or were not likely to recur were held overly broad, are not in point as respects the situation before us.
 
 
 17
 The Union argues, also, that the injunction is overbroad under the teachings of Boys Markets, supra. This objection may be analyzed only in the light cast by past controversies and cases. There is a basic conflict presented here, and in like cases, 'between the federal labor policy favoring arbitration provisions in collective bargaining agreements and the policy disfavoring injunctive relief against labor unions.'[12] The Norris-LaGuardia Act[13] was passed to curb what was felt to be the federal courts' misuse of their equity powers in labor-management controversies.[14] Section 4 of the Act, 29 U.S.C. 104, prohibits most temporary or permanent injunctions in labor disputes. Procedural safeguards with respect thereto are also prescribed. 29 U.S.C. 107-110. The countervailing influence is the encouragement of the settlement of labor disputes through the enforcement of compulsory arbitration agreements.[15]
 
 
 18
 The trend to the enforcement of collective bargaining agreements with compulsory arbitration[16] was 'abruptly halted'[17] by the Sinclair case.[18] There the court held that strikes in violation of compulsory arbitration clauses in collective bargaining contracts were under the proscriptions of the Norris-LaGuardia Act and hence could not be enjoined in the federal courts.[19]
 
 
 19
 The impact of Sinclair, however, was found to be detrimental to the best interests of both labor and management, the Boys Markets opinion pointing out that
 
 
 20
 The Sinclair decision * * * seriously undermined the effectiveness of the arbitration technique as a method peacefully to resolve industrial disputes without resort to strikes, lockouts, and similar devices. * * * We conclude, therefore, that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case.
 
 
 21
 398 U.S. at 252-253, 90 S.Ct. at 1594.
 
 
 22
 The Boys Markets opinion resurrected the labor injunction in a narrow field. But in so doing the Supreme Court pointed out that the Norris-LaGuardia Act still retained applicability in the area, and carefully limited the scope of the opinion:
 
 
 23
 We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance. The dissenting opinion in Sinclair suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief-- principles that we now adopt:
 
 
 24
 'A district Court entertaining an action under 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract does have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike.' * * * 398 U.S. at 253-254, 90 S.Ct. at 1594.
 
 
 25
 It is clear that the opinion considered also the possibility of remedial action directed toward future conduct in a proper case, the court continuing its quotation of the Sinclair dissent:
 
 
 26
 'Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity-- whether breaches are occurring and will continue or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.' 370 U.S. at 228, 82 S.Ct. at 1346.
 
 
 27
 398 U.S. at 254, 90 S.Ct. 1583.
 
 
 28
 The Union, citing Section 9 of the Norris-LaGuardia Act,[20] argues that the complaint set forth as a specific act in Court 1 only the work stoppage of June, 1973, to which, they argue, the injunction must be confined. The record does not sustain the argument made. The complaint, while not artistically framed, gave notice in Count 2 thereof, paragraph 19, that CF&I was seeking injunctive relief against future violations.[21]
 
 
 29
 But whatever ambiguities may have existed in or be read into the pleadings were clarified at trial. Testimony was offered, was received without objection, was weighed, and was ruled upon, concerning the entire course of past conduct of the Union. The court's opinion reflected the state of the record when it stated that the issue for decision: 'whether the eight strikes upon which the plaintiff relies in its claim for injunctive relief' should have been settled as prescribed by the grievance procedure. Upon this record it cannot reasonably be asserted that CF&I relied for relief on possibly only one claim pleaded in Count 1, not the eight actually presented at trial. There was here no claim of surprise, no lack of fair warning as to issues litigated. See also Fed.R.Civ.P. 15(b).
 
 
 30
 The Union urges that, since no injunctive relief was ordered by the trial court with respect to the June 11 incident involving portal-to-portal pay,[22] it was 'inconsistent' of the court, and error, to issue the injunction sought and ordered as to future conduct. The argument made represents a confusion of thought. Whether an injunction shall issue with respect to any particular stoppage, and the scope thereof, will depend upon an accommodation between the competing policies of 301 of the Labor Management Relations Act of 1947[23] and 4 of the Norris-LaGuardia Act[24] reached in the light of Boys Markets, Express Publishing and their progeny, as well as general equitable considerations. The injunction, if decreed, may or may not turn upon a particular incident and may or may not extend to future conduct. We find no error in the accommodation reached by the trial court after its careful review of all the facts and circumstances of the case.
 
 
 31
 In sum, what we see presented is an unlawful proclivity[25] on the part of the Union to pursue a course of conduct in violation of the agreement of the parties and detrimental to the harmony of the relationship and the best interests of both labor and management.[26] It may properly be enjoined within the limits found applicable. Given this pattern of conduct the precise number of violations is not critical should future repetition seem likely. We find no violation of the proper scope of injunctive relief unon this record.
 
 
 32
 The court found that neither the District nor the International levels of the United Mine Workers were involved in the strikes, particularly in view of the stipulation that in all of the strikes except that of May 1, 1969, the International, upon being notified by CF&I of the strikes, instructed the District to instruct the miners to return to work, which action the District took without delay. Upon the record made, the injunction properly ran against Local 9856, its officers and members.
 
 
 33
 Decree affirmed.
 
 
 
 *
 TALBOT SMITH, United States Senior District Judge, Eastern District of Michigan, sitting by designation
 
 
 [1]
 The action was brought in the district court by CF&I pursuant to 301 of the Labor Management Relations Act of 1947, 29 U.S.C. 185
 
 
 [2]
 This was the third such order obtained by CF&I against the Union since June 15, 1971
 
 
 [3]
 Specifically, the strikes were found to be in violation of the Union's obligation not to strike over arbitrable issues, an obligation the court held to be implicit in the arbitration clauses of the 1968 and 1971 agreements. See Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). The pertinent parts of the National Bituminous Coal Wage Agreement of 1971 are set out below; (the parallel provisions of the Agreement of 1968 do not differ significantly):
 Article XVII-- SETTLEMENT OF DISPUTES
 Section (b) Grievance Procedure
 Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time. (The parties will not be represented by legal counsel at any of the steps below.):
 (1) By the aggrieved party and his foreman who shall have authority to settle the complaint. Any grievance which is not filed by the aggrieved party within fifteen calendar days after he reasonably should have known of such grievance shall be considered invalid and not subject to further prosecution under the grievance machinery.
 (2) If no agreement is reached, the grievance shall be taken up by the mine committee and the mine management within five calendar days of the conclusion of step 1. A standard grievance form shall be completed and jointly signed by the parties to the grievance. Such a form will be agreed upon by the parties.
 (3) If no agreement is reached, the grievance shall be taken up by the UMW district representative and a designated representative of the Employer within ten calendar days of the conclusion of step 2.
 (4) If no agreement is reached, the grievance shall be taken up by the Board within ten calendar days of the conclusion of step 3 or in discharge cases within five calendar days of notice of appeal. The Board shall consist of four members, two of whom shall be designated by the Union and two by the Employer. Neither the Union's representatives on the Board nor the Employer's representatives on the Board shall be the same persons who participated in steps 1, 2, or 3 of this procedure.
 (5) Should the Board fail to agree the matter shall, within ten calendar days after decision by the Board, be referred to an umpire who shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and fees incident to the services of an umpire shall be paid equally by the Employer or Employers affected and by the Union.
 Article XX-- MAINTAIN INTEGRITY OF CONTRACT
 The United Mine Workers of America and the Employers agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' article of this agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts.
 
 
 [4]
 Citing inadequate attention to roof shoring and drainage needs at the Allen mine, and the adjustments to be required at the Minnequa Steel Mill if reduction in Allen mine coal were experienced
 
 
 [5]
 11 C. Wright & A. Miller, Federal Practice and Procedure 2955, at 546 (1973)
 
 
 [6]
 International Longshoremen Local 1291 v. Marine Trade Ass'n., 389 U.S. 64, 74, 88 S.Ct. 201, 206 19 L.Ed.2d 236 (1967)
 
 
 [7]
 Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1498-9 (1959)
 
 
 [8]
 The decrees in Old Ben Coal Corp. v. Local 1487, Mine Workers, 457 F.2d 162 (7th Cir. 1972) and N.Y. Tel. Co. v. Communications Workers, 445 F.2d 39 (2nd Cir. 1971), both relied upon by the Union, lack such specificity
 
 
 [9]
 It is clear from the context of the court's order that the injunction does not extend to such disputes which are 'national in character,' since these are exempted from compulsory arbitration under Article XX of the 1971 agreement, note 3 supra
 
 
 [10]
 See the Court's reaffirmation of this standard in a different factual context, Communications Workers v. NLRB, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960)
 
 
 [11]
 NLRB v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941); United States v. Republic Steel Corp., 286 F.2d 875 (7th Cir. 1961)
 
 
 [12]
 Note, The New Federal Law of Labor Injunctions, 79 Yale L.J. 1593 (1970)
 
 
 [13]
 29 U.S.C. 101-115
 
 
 [14]
 See, generally F. Frankfurter & N. Greene, The Labor Injunction (1930); Vladeck, Boys Markets and National Labor Policy, 24 Vand.L.Rev. 93, 94 (1970)
 
 
 [15]
 Avco Corp. v. Local 787, UAW, 459 F.2d 968, 970 (3rd Cir. 1972). See the 'Steelworkers Trilogy:' Steelworkers v. Am. Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); Note, Labor Injunctions, Boys Markets, and the Presumption of Arbitrability, 85 Harv.L.Rev. 636, 637-8 (1972)
 
 
 [16]
 The 'kingpin of federal labor policy,' Brennan, J., dissenting in Sinclair Ref. Co. v. Atkinson, 370 U.S. 195, 226, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962)
 
 
 [17]
 Note, Limitations on Court Issued Restraint Orders, 39 Brooklyn L.Rev. 1150, 1151 (1973)
 
 
 [18]
 Sinclair Ref. Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962)
 
 
 [19]
 The effect of Sinclair was to create a new dilemma: if its holding were limited to federal courts, and injunctive relief left available in state courts, the declared need for uniformity among state and federal courts with respect to enforcement of labor contracts would be destroyed; if Sinclair were extended to state courts, it would have to be done despite 'explicit evidence that Congress expressly intended not to encroach upon the existing jurisdiction of the state courts.' Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 509, 82 S.Ct. 519, 523, 7 L.Ed.2d 483 (1962)
 Monongahela Power Co. v. Local 2332, Elec. Workers, 484 F.2d 1209, 1212 (4th Cir. 1973)
 
 
 [20]
 29 U.S.C. 109 limits injunctive relief to the 'prohibition of such specific act or acts as may be expressly complained of in the bill of complaint * * * in such case and as shall be expressly included in said findings of fact * * *.'
 
 
 [21]
 'Unless ordered by this Court to do otherwise, defendants will in the future fail and refuse to pursue future disputes and controversies cognizable under the said Grievance Provision in accordance with procedures provided for therein.'
 
 
 [22]
 'Because we do not find that these latter four issues (inter alia portal-to-portal pay) are likely to recur, we conclude that no case for equitable relief has been established as to them.'
 
 
 [23]
 29 U.S.C. 185
 
 
 [24]
 29 U.S.C. 104
 
 
 [25]
 McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949): 'By its terms it enjoined any practices which were violations of those statutory provisions. Decrees of that generality are often necessary to prevent future violations where a proclivity for unlawful conduct has been shown.'
 
 
 [26]
 See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)