MOTION PICTURE STUDIO MECHANICS, LOCAL 52, INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES AND MOVING PICTURE MACHINE OPERATORS OF the UNITED STATES AND CANADA, AFL-CIO, Petitioner-Appellant,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee.

Nos. 487, 636, Dockets 78–4252, 78–4168.

United States Court of Appeals, Second Circuit.

Argued Jan. 18, 1979.

Decided Feb. 15, 1979.

Edward J. Quinlan, O'Connor, Quinlan & Mangan, P. C., New York City, for petitioner-appellant.

Sandra K. Williams, N. L. R. B. (William R. Stewart, Deputy Asst. Gen. Counsel, Washington, D. C., of counsel), for respondent-appellee.

Before OAKES, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

This case comes before the court on a petition by the Motion Picture Studio Mechanics, Local 52 (the Union), to review a decision and order issued by the National Labor Relations Board (the Board). The Board seeks enforcement of its order. The Board found that the Union attempted to cause and did cause Michael Levee Productions, Ltd. (the Company), to refuse to hire Michael Goldbaum, a sound-mix engineer, in violation of §§ 8(b)(2) and 8(b)(1)(A) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(b)(2), 158(b)(1)(A). The Board issued a back pay order as well as a broad order requiring the Union to cease and desist from causing the Company or any other employer to discriminate against Goldbaum or any other employee or job applicant because of nonmembership in the Union.

Petitioner alleges that there was insufficient evidence on the record to support the Board's findings and that the Board's remedial order was improper. For the reasons discussed below, we find these claims without merit; we therefore affirm the order of the Board and grant its application for enforcement.

I. THE FACTS

In May 1977 the Company agreed to produce a motion picture entitled "Slow Dancing in the Big City" that United Artists was to finance and distribute. John Avildsen was director and coproducer, and as such he had the authority to recommend the hiring of personnel for the production of the movie. Although Michael Levee, president of the Company and coproducer, actually hired the personnel, in fact Levee usually followed Avildsen's recommendations. Neither the Company nor United Artists had any contract with the Union.

In June, Avildsen spoke with Goldbaum about the possibility of employing him on the picture as the sound mixer because the two had worked together previously. Avildsen, who was aware that Goldbaum was not a Union member, told him that if there were no union problems he would be hired. Goldbaum spoke with the Company's production manager, and they reached an understanding as to Goldbaum's working conditions and compensation in the event that he was hired.

Meanwhile, Avildsen contacted the Union because he felt that it would be necessary for Goldbaum either to join the Union or to get its approval to work on this particular picture. As a result, Avildsen and Michael Proscia, the Union's business manager, together with the Union's vice president and the Company's production manager, met for lunch in late June to discuss Goldbaum's employment. Proscia indicated that it was unlikely that the Union would admit Goldbaum to membership. Avildsen then asked Proscia what would happen if the Company hired Goldbaum anyway. On the basis of disputed testimony and express evaluations of the credibility of the witnesses, the administrative law judge (ALJ) found that Proscia had replied that he might have to take "some kind of action"; and on the undisputed testimony, indeed an admission by Proscia himself, the ALJ found that when Avildsen asked what kind, Proscia answered, "That's for me to know."

In July, Goldbaum requested a letter of commitment. He received a letter from Levee stating that the Company desired to use him but that he must first join the Union because "We are obligated to hire a person in your position from [the] Union"; evidently Levee was under a misimpression, for the Company was under no such legal obligation. In late August, after discussions between Levee and Avildsen, Levee informed Goldbaum that the Company would not use him on the movie.

Goldbaum filed a charge with the Board, which subsequently issued a complaint. Under § 10(j) of the NLRA, 29 U.S.C. § 160(j), the Board sought, and the district court granted, a preliminary injunction enjoining the Union from interfering with Goldbaum's employment during the pendency of the Board's proceedings. Thereafter the Board held an administrative hearing, and the ALJ found that the Union had attempted to cause and did cause the Company not to hire Goldbaum. He found that Proscia's comments threatened action of a kind "for me to know" were coercive and determined that if the Union had not threatened retaliatory action, the Company would probably have hired Goldbaum. He therefore recommended the back pay order and, in light of another similar incident some nine months earlier,[1] the broad order to cease and desist. The Board affirmed his rulings, findings, and conclusions and adopted his recommended order. This petition followed.

## II. SUFFICIENCY OF THE EVIDENCE

■ The Union's position is that there was not enough evidence on the record to justify a finding that Proscia's threats caused Levee not to hire Goldbaum. It relies heavily on Levee's testimony that he did not recall that Avildsen had told him of the threats. Such reliance is misplaced. There is adequate evidence, notwithstanding the testimony of Levee, to support the ALJ's findings.

There is undisputed evidence to support the finding that Proscia did make a statement that threatened possible union action if the Company hired Goldbaum. Three of the four people at the luncheon meeting, including Proscia himself, testified to the making and the wording of at least part of the statement; the ALJ's finding as to the rest of the statement is supported by substantial evidence and is not clearly erroneous.

The record also supports the inference that Proscia's opposition to Goldbaum influenced Avildsen and therefore affected the hiring of Goldbaum. The evidence reveals that both Levee and Avildsen wanted to hire Goldbaum. Not only did they testify that this was their intent, but the Company had made a conditional offer of employment to Goldbaum, had arranged the terms of that employment, and had sent a letter of commitment. After the meeting with Proscia, however, Levee and Avildsen decided not to hire Goldbaum because he was not a member of the Union. The evidence does not suggest that Levee's desire to hire only Union members motivated this rejection, as petitioner contends. Avildsen made the offer to Goldbaum knowing that Goldbaum was not a member of the Union; the letter of commitment reflected the same understanding and yet at the same time a desire to hire Goldbaum. Levee's explanation of why he wanted Goldbaum to join the Union was that he felt that the Company was *obligated* to hire only Union members. We believe that this evidence is sufficient to support the Board's findings that Proscia's threats affected Avildsen's actions and thereby caused the Company not to hire Goldbaum. Had Proscia made no threats, Avildsen's recommendation of Goldbaum would have been without qualification. Similarly, in the absence of any threats, Avildsen would probably have corrected Levee's erroneous impression that the Company was obligated to hire only Union members. Thus petitioner's argument that there is no causal connection between Proscia's threats and the Company's refusal to hire Goldbaum is without merit.

A separate ground justifying the Board's finding is that Proscia's actions influenced Levee, as well as Avildsen, not to hire Goldbaum. Although there is no direct evidence indicating Levee's knowledge of, and response to, Proscia's threats, the inference may be drawn that Proscia's actions ultimately influenced Levee. Proscia admitted that he discussed Goldbaum's employment with Levee; thus the ALJ could reasonably refuse to give credit to Levee's testimony that he did not remember such a conversa-

---

**1.** *See* text *infra.*

tion. Similarly, the ALJ could have reasonably refused to credit Proscia's testimony that he told Levee that Levee was free to hire anyone he pleased. The numerous inconsistencies and contradictions in Proscia's testimony as well as his obvious self-interest may have cast doubt on his credibility. Levee's continued belief, subsequent to his conversation with Proscia, that the Company must hire only Union members suggests that even if Proscia did not expressly so advise Levee, Proscia did nothing to correct Levee's mistaken impression, an impression that was based on an "understanding for many, many years."

Moreover, even if Levee and Proscia had never discussed the hiring of Goldbaum, the Board had ample justification for inferring that Levee was aware of the substance of the conversation between Avildsen and Proscia.[2] Levee testified that he had met with Avildsen to discuss the meeting with Proscia but insisted that he did not recall being told the details of the meeting. In view of Levee's questions about whether Goldbaum had been accepted into the Union, his knowledge of Avildsen's changed recommendations regarding Goldbaum, and his decision not to hire Goldbaum, it was reasonable for the Board to infer that he was aware of the substance of the conversation between Avildsen and Proscia and that it affected him.

### III. THE ORDER

■ Given the Union's violation, we turn to the question whether the remedy was appropriate. The back pay order was clearly appropriate, for it was designed to make Goldbaum whole for losses suffered as a result of unfair labor practices. *NLRB v. J.*

**2.** We have recognized that the Board may base its finding of a violation upon circumstantial evidence alone. *NLRB v. Long Island Airport Limousine Serv. Corp.*, 468 F.2d 292, 295 (2d Cir. 1972). And as another court has noted, "[i]nferences from the evidence almost universally are the only way of determining motive." *Polynesian Cultural Center, Inc. v. NLRB*, 582 F.2d 467, 473 (9th Cir. 1978).

**3.** The Union was ordered, *inter alia*, to cease and desist from:

*H. Rutter-Rex Manufacturing Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969).

■ In considering whether this order, directed to other employers as well as to other employees or job applicants,[3] was too broad in scope, we recognize that

[t]he breadth of the order, like the injunction of a court, must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the [party] in the past.

*NLRB v. Express Publishing Co.*, 312 U.S. 426, 436–37, 61 S.Ct. 693, 85 L.Ed. 930 (1941); *NLRB v. Local 282, International Brotherhood of Teamsters*, 428 F.2d 994 (2d Cir. 1970). Since the *Express Publishing* case, this court has upheld injunctions forbidding acts in relation to unknown persons "so long as, at the time the injunction issued, there was reason to fear that future violations would result from a pattern or plan of illegal activity already instituted." *NLRB v. Local 282, International Brotherhood of Teamsters, supra*, 428 F.2d at 999.

■ In this particular case, the ALJ relied on the Union's quite recent similar action in causing the American Broadcasting Company to fail to hire an employee because of her lack of Union membership. *Motion Picture Studio Mechanics, Local 52*, 226 N.L.R.B. 212 (1976). In our view two closely similar §§ 8(b)(2) and 8(b)(1)(a) violations within such a short time frame sufficiently establish a proclivity to continue the unlawful conduct. Both cases involved action by Proscia, a high-ranking Union official, that caused the companies not to hire

Causing or attempting to cause Michael Levee Productions, Ltd., or any other employer to deny Michael Scott Goldbaum or any other employee or job applicant employment as a sound mixer or otherwise to discriminate against him or other employees or job applicants in violation of Section 8(a)(3) of the Act because of nonmembership in Respondent labor organization.

non-Union members as sound mixers. Moreover, the occurrence of the second violation only nine months after the decision and order in the first case indicates that the limited order there was not effective. The broad order thus reflects the Board's and this court's judgment that in the absence of an order of that scope, the Union is likely to repeat the practice complained of here in situations involving other employers and employees or job applicants. *NLRB v. Building & Construction Trades Council*, 578 F.2d 55, 59 (3d Cir. 1978), modifying a similarly broad order, is inapposite, for there the picketing involved in each of the two cases was for different purposes. Here the violations were the same in each case.

Accordingly, the petition to review the order of the Board is denied and the cross-application for enforcement is granted.